# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JOSHUA WEAVER,**

      **Plaintiff,**

**v.**                                     **Case No.: 6:08-cv-510-Orl-28KRS**

**ALLSTAR BUILDING MATERIALS, INC.**

      **Defendant.**

_____/

## DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT

Defendant, ALLSTAR BUILDING MATERIALS, INC. ("ABM or Defendant"), by and through its undersigned counsel, files its motion for final summary judgment for the following reasons:

1.     On April 7, 2008, the Plaintiff, JOSHUA WEAVER ("Mr. WEAVER or Plaintiff"), filed his one (1) Count Complaint against ALLSTAR BUILDING MATERIALS, INC. ("ABM), for violation of the Fair Labor Standards Act ("FLSA").[1]

2.     On May 8, 2008, counsel for the Defendant filed its Answer and affirmative defenses including the affirmative defense of the Portal to Portal Act.  (Doc. 8, ¶ 18).[2]

---

[1]

    Plaintiff's counsel for this case brought two (2) other Fair Labor Standards Act complaints against the Defendant in the District Court, Middle District of Florida.  These cases are *Balzarano v. Allstar Building Materials, Inc*., Case No.:  6:08-cv-281-Orl-31 GJK ("*Balzarano*") and *Knight v. Allstar Building Materials, Inc*., Case No.: 6:08-cv-457-Orl-22-DAB.  *Balzarano* was dismissed in summary judgment for Defendant, ABM, on July 16, 2009.  (See *Balzarano* docket # 62).

[2]

    The Clerk of Court entries on the docket for the above captioned case will be referred to as "Doc. X" with the "X" referring to that particular docket entry number.

3.      Dispositive motions are due July 21, 2009.  (Doc. 20, p. 1).

## MEMORANDUM OF LAW

**I.      Plaintiff's Complaint Does Not State a Cause of Action.**

In Plaintiff's bare bones Complaint, lacking any real detail factually, Count I, the one (1) and only count that is raised, alleged in a conclusory manner that the Defendant, "[t]hrough the employment of Plaintiff Mr. Weaver, the Defendant ABM repeatedly and willfully violated Section 7 and Section 15 of the Fair Labor Standards Act by failing to compensate Plaintiff Mr. Weaver at a rate not less than one and one-half times the regular rate at which he was employed for work weeks longer than forth (sic) (40) hours." (Doc. 1 ¶ 10).[3]  The Complaint continued stating, "Specifically, Plaintiff worked numerous weeks in excess of forty (40) house (sic) a week, yet was not compensated for all work in excess of forty (40) hours at a rate not less than one and one-half times the regular rate at which he was employed." (Doc. 1, ¶10).

Nowhere within the Complaint did the Plaintiff  specifically allege the circumstances where the Defendant failed to pay overtime, but only that ABM failed to pay overtime for time worked over a forty (40) hour week.  (Doc. 1, ¶ 10).  Nowhere within the Complaint did the Plaintiff allege the dates that he was not paid overtime.  (Doc. 1).  Nowhere within the Complaint did the Plaintiff allege that he was not paid for travel time after performing work for the Defendant.  *Id.*  Nowhere within the Complaint did the Plaintiff allege that he complained about not being paid overtime to his employer, ABM.  *Id.*  The Plaintiff has offered nothing more than "bare assertions" in his Complaint

---

[3]

Plaintiff states in his Complaint that an FLSA violation occurred and that the Court has jurisdiction, ". . . for the state law claim under the doctrine of pendent jurisdiction."  (Doc. 1, ¶ 2).  However, no count was brought for a violation of any state law claim.  *Id.*  Because there is no count on any state law claim, no state law claim will be addressed.

which at best, are conclusory and not entitled to being assumed as true.  See *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951; 173 L. Ed. 2d 868 (2009)("*Ashcroft*")("It is the conclusory nature of respondent's allegations . . . that disentitles them to the presumption of truth.").   In a summary judgment, determining if a genuine issue of fact exists is a question of law which "sits near the law-fact divide." *Id.* at 1947.

In *Ashcroft*, the Supreme Court referred to its previous decision in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 ( 2007) and noted that the *Twombly* Court first addressed the elements necessary to make that claim.  *Ashcroft.* at 1947.  The *Ashcroft* Court also began by noting the elements that must be plead for that claim.  *Id.*  The *Ashcroft* Court, after referring to the plaintiff's complaint, referred to Fed. R. Civ. P. 8(a)(2).  *Id.* at 1949.  The *Ashcroft* Court stated:

> As the Court held in *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, **the pleading standard *Rule 8* announces does not require "detailed factual allegations,"** *but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation*. *Id*., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). **A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do**." 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929. **Nor does a complaint  suffice if it  tenders "naked assertion[s]" devoid of "further factual enhancement**." *Id*., at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929.  (*Ashcroft* at 1949)(emphasis added).

Likewise, Plaintiff's  one Count Complaint offers nothing more than "naked assertion[s]" and basically made the accusation that, "the-defendant-unlawfully-harmed-me . . .".  *Ashcroft* at 1949 (quoting *Twombly* at 555).

## II.   Plaintiff was Paid for Working Overtime when he Worked it.

Assuming, *arguendo*, that the Plaintiff's Complaint stated a cause of action, which the Defendant does not concede, it is undeniable that Mr. WEAVER was paid time and a half for working over forty (40) hours.  In the Defendant's response to this Court's Scheduling Order (Doc.10, 14, 14-2, 14-3), a verified summary of hours worked was presented which documented that Mr. WEAVER was paid for overtime.  (Doc. 14, 14-2, 14-3).  This verified summary of hours was

based upon an investigation of the payroll records kept in the ordinary course of business at ABM. (Doc. 14-2, ¶¶ 2, 4, 10).   In fact, Mr. WEAVER, was paid one hundred, ninety hours (190) of overtime between October 4, 2006 through November 11, 2007. (Doc. 14-2 ¶ 5; 14-3).  This equates with over four and one-half (4 ½) weeks of overtime paid to the Plaintiff during this time period. *Id.*  Mr. WEAVER  remembers being paid overtime.  (Exhibit A, depo p.43, l. 18-20).  When asked, Mr. WEAVER could not testify to what time he was not paid overtime.   In fact, he could not even honestly recall when he first had the idea that he wasn't paid overtime.  Mr. WEAVER testified:

> Q  All right. Now, when's the first time you got the idea that you had
> unpaid hours?
>
> MR. HARR: Do not discuss any conversations that you and I have
> had or you had with my office.
>
> THE WITNESS: I don't recall, honestly.
>
> (Exhibit A, p. 27, l. 20-25).

Mr. WEAVER later changed his testimony regarding when he first received the idea that he was due overtime.  Mr. WEAVER testified,

> Q  All right. When did you first get the idea that you had unpaid
> hours, when did that first come to your mind?
>
> A  It had always been on my mind.
>
> (Exhibit A, p. 28, l. 16-19).

Even with payroll records made available to him much in advance of his deposition, Mr. WEAVER did not know what was wrong with his payroll records.  (Exhibit A, p. 29, l. 2 to p. 31, l. 2).  Specifically, Mr. WEAVER testified:

> Q  All right. Early on in this case we produced all your pay records to
> Mr. Harr. Did you go over those?
>
> A  I went over 'em I, think, with Jason.
>
> Q  All right. I don't want to know what you talked about, but what's
> wrong with those records, if anything?
>
> A  What's wrong with the records?

4

Q  Yes.

A  I would have to discuss it with my attorney.

Q  No. I don't want to know anything about a lawyer. You reviewed the records. What did you find that was wrong with the records?

A  I don't recall anything. I mean, I don't -- like I said, I would have to discuss it with my lawyer.

Q  All right. But as we sit here you reviewed 'em  and you don't think -- you can't remember anything wrong with them, correct?

A  No, that's not true.

Q  All right. Tell me what's wrong with them?

A  I really, like I said, I'd have to discuss it with Jason. I don't really know -- I haven't really discussed that. I'm not familiar with 'em, honestly.

MR. HARR: I think he's not understanding the question, Mr. Morello.

THE WITNESS: Maybe I am misunderstanding.

BY MR. MORELLO:

Q  All right. You looked at the records that we provided.

A  Well --

Q  Those were your timesheets.

A  -- they were presented to me, yes.

Q  Okay. Did you find anything wrong with those records, records that were erroneous, that were false, anything like that?

A  I don't recall.

Q All right. So basically as I understand what you believe your claim is, why you sought out Mr. Harr is hours you claim you worked that you weren't paid for for being at the jobsite early and for riding in the truck?

MR. HARR: Object to form.

BY MR. MORELLO:

Q  Is that correct?

A  Riding and loading materials. I was supposed to be there at 5:30 and we weren't paid for time that we loaded the truck and materials and also driving time.

Q  All right. Is this every day throughout your employment?

A  Yes.

Q  So you would ride the truck every day throughout your employment?

A  Yes.

(Exhibit A, p. 29, l. 2 to p. 31, l. 2).

Mr. WEAVER's memory as to not knowing the amount, if any, due him for overtime, was consistent with his Fed. R. Civ. P. 26 disclosures where he stated that his damages were undetermined. (Exhibit B, Rule 26 disclosure, ¶ 3).

However, Mr. WEAVER's memory for his deposition of November 16, 2008, contrasted significantly from his affidavit testimony to this Court in his Responses to the Court's Interrogatories as to the hours he regularly kept while working for ABM.  (Doc. 13). Mr. WEAVER swore under oath to this Court that he was regularly scheduled to work from 7:00 a.m. through 3:30 p.m., Monday through Friday.  (Doc. 13, ¶ 3).  In deposition testimony, Mr. WEAVER swore that his hours were from 5:30 a.m. until between 4:00 and 5:00 p.m..  Mr. WEAVER testified:

Q  Okay. So you knew you were scheduled to be there at 5:30, and when were you scheduled to be home or get off work I should say?

A  There was no -- there's no scheduled home time.

Q  All right. I should say was there a scheduled end of the day or just a scheduled beginning of the day?

A  It really depended on the job and the supervisor what time we left the job at the end of the day.

Q  All right. But you were always scheduled to be there at 5:30, correct?

A  Yes.

Q  Is that correct?

6

A  Yes.

Q  All right. Typically when would you leave the job?

A  Usually between the hours of 4:00 and 5:00 or maybe it depended, like I said.

(Exhibit A, p. 31, l. 16 to p. 32, l. 7).

Mr. WEAVER's memory as to the amount of overtime he was owed, six (6) months after he filed his Responses to the Court's Interrogatories still remained consistent. He still didn't know how much he was owed. (Exhibit A, p. 44, l. 25 to p. 45, l. 19; Doc. 13, ¶¶ 6 c, 6 d, 6 e). Specifically, Mr. WEAVER testified;

Q  Did you ever attempt to figure out how much time you're claiming that Allstar owes you?

A  Through discussions with my lawyer.

Q  All right.  I don't want to know about those discussions.

A  Okay.

Q  Did you ever come up with a number, even an average number before you went to the lawyer?

A  No.

Q  Okay.  How much time are you claiming in hours?

A  That's between me and my lawyer, I believe,  right?

Q  Well, you should know how much time you're claiming.  I'm not asking you about discussions.

A  How much time I'm claiming they owe me?

Q  Yes.

A  I haven't really discussed it with him yet.

Q  Okay.  Before you went to the lawyer did you  try to calculate how much time you believed you were owed?

A  No, I didn't.

(Exhibit A, p. 44, l. 25 to p. 45, l. 19).

Mr. WEAVER later testified that without discussing the amount he believes he is owed with his attorney, that he had no idea of how much, if any, overtime was owed him.  He testified,

> BY MR. HARR:
>
>  Q   Do your timesheets from Allstar Building Materials reflect what time you would return from a job  that was out of the county?
>
>  A   No.
>
>  Q   Okay.  Do your timesheets from Allstar Building Materials only reflect the time that you left a jobsite that was out of the county?
>
> A   Yes.
>
> MR. HARR: Okay.  That's all I have.  You have any follow up, Mr. Morello?
>
> REDIRECT EXAMINATION
>
> BY MR. MORELLO:
>
> Q   If you know that that's what they reflect, how come you said you have to talk to your lawyer to figure out what's owed?
>
> MR. HARR:  Object to the form.
>
> MR. MORELLO:  Go ahead.
>
> THE WITNESS:  Because I didn't want to -- I don't want to say something -- I'm not really sure.  That's why.  Because I haven't really discussed it with him, so I don't know.
>
> (Exhibit A, p. 60, l. 4-24).

Mr. WEAVER had his payroll records from on or about May 29, 2008 (Doc.10 ¶ 2; Exhibit C, ¶ 3), yet during his deposition, approximately six (6) months later, still had no idea how much money, if any, in overtime he was owed. (Exhibit A, p. 1, l. 15).  Clearly, Mr. WEAVER has no claim against ABM for any overtime due.

Mr. WEAVER also testified that he did not drive to any of the jobsites he worked on.  Mr. WEAVER testified:

> Q   So you would ride the truck every day throughout your employment?

8

A  Yes.

Q  Okay. Did you ever drive to a jobsite on your own?

A  No.

(Exhibit A, p. 30, l. 25 to p. 31, l. 5).

However, in his interrogatory answers, Mr. WEAVER swore that he drove his own vehicle to Ponce Inlet and to the Bella Vista projects.  (Exhibit C, # 2).  Mr. WEAVER testified at his deposition that he sometimes drove an ABM vehicle to jobsites.  Mr. WEAVER testified that:

Q  All right. Who were the drivers you remember?

A   Mike Bates was a driver. I actually drove sometimes. It just depended on who they trusted to drive the trucks.

Q  Did you have proper licensing to drive one of their trucks?

A  Yes, I did.

Q  All right. So Mike Bates. Who else drove?

A  I believe Josh drove sometimes.

Q  Which Josh?

A  Chris. Josh Balzarano.

Q  Okay.

A  And Chris, I can't remember his last name. Paul, of course, drove a lot.

Q  Paul Via?

A  Tom Verble drove a lot.

Q  And you?

A  Occasionally.

(Exhibit A, p. 35, l. 16 to p. 36, l. 8).

Mr. WEAVER further testified that ABM had no requirement for him to make a notation regarding when he was the driver of an ABM vehicle.  (Exhibit A, p. 36, l. 9-11).  However, on June 2, 2009, Mr. WEAVER swore in his answers to the Third Set of Interrogatories to Defendant that, "As of this

9

date, Mr. Weaver recalls riding in vehicles owned by ABM in which the following people drove: .
. .".  (Exhibit C, # 1).

Admittedly, while ABM does not have some physical time records that the Plaintiff filled out
which were supposed to be turned in, ABM does have all payroll records including those showing
overtime payments made to Mr. WEAVER.  (Doc. 14 through Doc. 14-3; Exhibit D).  It was the
policy of ABM to pay overtime in compliance with the Fair Labor Standards Act ("FLSA").
(Exhibit E, ¶ 5, see attached exhibit B).  Mr. WEAVER was paid for the overtime he worked.  (Doc.
14-3; Exhibit D).

ABM also had an open door policy if any employee had any complaints.  (Exhibit E, ¶ 4 see
also attached exhibit A).  The bottom line to Mr. WEAVER's Complaint of not being paid overtime
is that he does not know that he wasn't paid properly during his working time at ABM even though
he had his payroll records made available to him during this litigation.  (Exhibit A, p.29, l. 2 to p.
30, l. 11).  Mr. WEAVER had no idea how much overtime, *if any*, he was owed before filing an
overtime claim against ABM.  (Exhibit A, p. 45, l. 17-19).  Mr. WEAVER testified, "Q  Okay.
Before you went to the lawyer did you try to calculate how much time you believed you were owed?
A  No, I didn't."  *Id.*  Mr. WEAVER, as well as the other two plaintiffs, never brought to ABM
President, Mr. Crowe's attention, any complaint of not being paid overtime.  (Exhibit E. ¶ 6).

### III.  <u>Plaintiff is Not Entitled to Overtime for Travel.</u>

Assuming, *arguendo*, that the Plaintiff's overtime claim includes travel time for performing
preliminary and postliminary work prior to volunteering to ride in Defendant's vehicle to his
principal activity, which the Defendant does not concede, Plaintiff's argument is still without merit.
First, he did not claim travel time in his Complaint.  Second, the Plaintiff did not claim that he
performed preliminary or postliminary work prior to his principal activity in his Complaint.[4]  (Doc.

---

[4]

'Preliminary activity' mean[s] an activity engaged in by an employee before the
commencement of his 'principal' activity or activities, and the words 'posliminary activity' means
an activity engaged in by an employee after the completion of his 'principal' activity or activities."

1).  Thirdly, if he had performed any work preliminary or postliminary to his principal activity, it was minimal.  (Exhibit E, ¶ 11; Exhibit F, ¶¶ 16-17; Exhibit G, ¶¶ 15, 16).  In fact, Mr. WEAVER often brought a pillow and blanket along for the ride and slept.  (Exhibit G, ¶ 12).

Mr. WEAVER testified that he always rode in an ABM truck to jobsites and had to load material prior to going to a jobsite.  (Exhibit A, p. 30, l. 12 to p. 31, l. 5).  However, in ABM President, Mr. Crowe's sworn affidavit, he stated that employees, like Mr. WEAVER, had a choice to drive their own vehicle to the job site or ride in an ABM owned truck in order for the employee to save money as well as wear and tear on their own personal vehicles.  (Exhibit E, ¶¶ 7-9).  Former ABM Supervisor Mr. Verble and Trim Division Superintendent, Mr. Heino, also both stated in their affidavits that riding in an ABM vehicle was voluntary.  (Exhibits G, ¶¶ 5, 13; Exhibit F, ¶ 5).  Mr. WEAVER, like other ABM voluntary riders, were not only picked up from the ABM yard, but were also picked up at Publix or other locations for their convenience.  In fact, Mr. WEAVER was picked up at Publix from time to time. (Exhibit G,¶ 12).  Riders were also picked up at the Waffle House or at similar locations to make meeting the ABM truck convenient for the ABM employees who chose to ride in an ABM truck.  (Exhibit G, ¶ 12; Exhibit F, ¶ 12).

Activities, if any, that Mr. WEAVER performed preliminary or postliminary to the work day were minimal because tools and materials were either delivered by other trucks, already on the jobsite or loaded by the paid driver. (Exhibit E, ¶ 11; Exhibit F, ¶ 15).  These minimal duties, if any, that Mr. WEAVER claims to have performed, were not "integral and indispensable" to ABM because ABM had paid employees perform any work that was "integral and indispensable".  (Exhibit E, ¶¶ 11, 12; Exhibit F, ¶¶ 7, 8, 11; Exhibit G, ¶¶ 5, 7, 8) .

"[T]he fact that certain preshift activities are necessary for employees to engage in their activities does not mean that those preshift activities are "integral and indispensable' to a 'principal activity' under *Steiner*." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 40-41 (U.S. 2005).

---

(29 C.F.R. § 790.7 (b).  Principal activity is defined, "The 'principal' activities referred to in the statute are activities which the employee is 'employed to perform'".  (29 C.F.R. 790.8, FN 55).

11

29 USC § 254 states:

> Relief from liability and punishment under the Fair Labor Standards Act of 1938, the Walsh-Healey Act, and the Bacon-Davis Act for failure to pay minimum wage or overtime compensation
>
> (a) **Activities not compensable. Except as provided in subsection (b), no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities** of such employee engaged in on or after the date of the enactment of this Act [enacted May 14, 1947]-- (1) **walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.** For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.
>
> (b) Compensability by contract or custom. Notwithstanding the provisions of subsection (a) which relieve an employer from liability and punishment with respect to an activity, the employer shall not be so relieved if such activity is compensable by either (1) an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or (2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer.
>
> (c) Restriction of time employed with respect to activities. For the purposes of subsection (b), an activity shall be considered as compensable under such contract provision or such custom or practice only when it is engaged in during the portion of the day with respect to which it is so made compensable.
>
> (d) Determination of time employed with respect to activities. In the application of the minimum wage and overtime compensation provisions of the Fair Labor Standards Act of 1938, as amended, of

12

the Walsh-Healey Act, or of the Bacon-Davis Act, in determining the time for which an employer employs an employee with respect to walking, riding, traveling, or other preliminary or postliminary activities described in subsection (a) of this section, there shall be counted all that time, but only that time, during which the employee engages in any such activity which is compensable within the meaning of subsections (b) and (c) of this section.  (Emphasis added).

In a 4th Circuit case involving construction employees and ride time, *Ralph v. Tidewater Construction Corp*., 361 F.2d 806 (4th Cir. 1996), the 4th Circuit Court found:

The District Judge, we think, should have granted the Contractor's motion for Judgment on the pleadings or their Motion on the same ground for directed verdict. He rightly felt that travel time was within § 4(a) and so charged the jury." *Id.* at 809.

Tidewater Construction Corp. and Meritt Chapman & Scott Corp. were contractors for the construction of a bridge tunnel for the Chesapeake Bay. *Id.* at 807-808.   The workers had to have transportation from the shore to their places of work in the Chesapeake Bay. *Id.*  at 808.  However, what complicated this ride time case was the fact that there were various union agreements which attempted to make ride time compensable. *Id.*   One of the exceptions to 29 U.S.C. § 254 § 4(a) of the Portal-to-Portal Act is contained in § 4(b)(1), "an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent or collective bargaining representative and his employer".  *Id.* at 809.  The District Court Judge had erroneously submitted the question to the jury of whether the contractors had in good faith relied upon an administrator's ruling. *Id.*  Because the jury found for the contractors, the 4th Circuit found that the trial court's error in submitting this issue to the jury was harmless.  *Id.* at 810.

In *Kavanagh v. Grand Union Co.,* 192 F.3d 269 (2nd Cir. 1999) the Second Circuit was confronted with an employee who claimed travel time because he did not have a fixed work location as a refrigerator and utility mechanic.  The appellant, *Kavanagh*, would have to travel to almost fifty stores in Connecticut and New York.  On some days he would travel to more than one work site. *Id.* at 271.  *Kavanagh* alleged that he traveled on average eight hours per day. *Id.*  The District Court dismissed *Kavanagh*'s FLSA claim based on the Portal-to-Portal Act. *Id.* at 272.  The Second Circuit

13

affirmed, finding:

> Here, 29 C.F.R. §§ 785.35 specifically provides that employers are not required to compensate employees for their "normal travel" between home and work. We interpret "normal travel," as used in this regulation, to refer to the time normally spent by a specific employee traveling to work. The term does not represent an objective standard of how far most workers commute or how far they may reasonably be expected to commute. Instead, it represents a subjective standard, defined by what is usual within the confines of a particular employment relationship. This construction is consistent with the overall regulatory scheme and with the interpretations given by other courts and the Department of Labor ("DOL") itself when confronted with similar cases. (*Kavanagh* at 272-273). (Citing *United Transp. Union Local 1745 v. City of Albuquerque,* 178 F.3d 1109,1120-21 (10th Cir. 1999), *Imada et. al. v. City of Hercules,* 138 F.3d 1294, 1297 (9th Cir. 1998) and *Vega v. Gasper,* 36 F.3d 417, 424-25 (5th Cir. 1994)).

In *Kroll v. Home Depot U.S.A., Inc.,* No. CV202-113, 2003 U.S. Dist. LEXIS 24903 at *1 (S.D. GA August 20, 2003), the appellant, *Drury,* claimed she was not compensated for travel time to meetings on six occasions during her employment. *Id.* at *4. She was paid for the time she attended meetings and travel time as straight pay. *Id.* *Drury* argued travel time should be paid as overtime. *Id.* Time spent in transit is generally not compensable under the *FLSA.* The District Court determined that:

> Under the Portal-to-Portal Act exception to the FLSA, employers are not required to pay employees for "walking, riding or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a)(1) (2003). Normal home-to-work and work-to-home travel is not compensable under the *Portal-to-Portal Act.* However, the employer is required to pay the employee for travel time for "special" or "unusual" assignments to another city. 29 C.F.R. § 785.37 (2003).

> What constitutes "special" or unusual" assignments under 29 C.F.R. § 785.37 has not been addressed by the Eleventh Circuit. Home Depot points to the Ninth Circuit decision in *Imada v. City of Hercules,* 138 F.3d 1294 (9th Cir. 1998)*,* as persuasive. In *Imada*, the court held that mandatory off-site training attended by city police officers was not an "unusual assignment" such that time spent commuting from their homes to the training would be compensable under the *FLSA. Id.* at 1297. The court reasoned that such training could not be deemed "special" or "unusual" because it was a normal, contemplated, and mandated incident of their employment. *Id.* The court also held that the infrequency of the off-site training (only a few

14

times a year) did not automatically make the travel "special" or "unusual." *Id.*

The Court finds the reasoning in *Imada* persuasive and finds that the off-site training and meetings *Drury* attended were not "special" or "unusual" as contemplated in 29 C.F.R. § 785.37.  (*Id.* at *9 - *12).

*Drury*'s claims under the FLSA for such travel to off-site training and meetings was denied.  *Id.*  The

District Court granted *Home Depot U.S.A.* Summary Judgment on this issue.

In *United Transportation Union Local 1745 et. al. v. City of Albuquerque,* 178 F.3d 1109

(10th Cir. 1999), bus drivers won a Summary Judgment at the District Court for to and from travel

from relief points at the end of a split shift but lost Summary Judgment on travel time to and from

their first or last or only shift of the day. *Id.* at 1115.  The 10th Circuit upheld the Summary Judgment

for the employer on the issue of shuttle time bus drivers for either their first, last or only run of the

day.  The court found:

> This is classic commuting-to-work time, excluded from compensation by the Portal-to-Portal Act. The fact that the drivers use City operated shuttles is irrelevant. Just as with any commute, the undisputed evidence in this case establishes that the drivers are obligated only to appear on time at the particular place from which their first bus runs begins, whether that is the City garage or some relief point. At the end of the day, following their last bus run, they may go home any way they choose, by any means they choose. The fact that some of them may choose to use a City shuttle to go to or from the City garage, as a part of their commute at the beginning or end of their workday, does not transform that time into hours worked under the FLSA and the Portal-to-Portal Act. See *Baker v. GTE North, Inc.,* 110 F.3d 28, 30-31 (7th Cir. 1997) (holding that an employee who drove his employer's car to the main office at the end of the day, and then drove his own car home, could not be compensated for any of the travel time); *Vega v. Gasper,* 36 F.3d 417, 425 (5th Cir. 1994) (holding that farm workers who chose to ride employer's bus for 1 ½ to 2 hours to and from fields, but were not obligated to ride such buses, were engaged in non-compensable "home-to-work-and-back commute").
> (*Id.* at 1120).)  (Citing to the Employee Commuting Flexibility Act of 1996, § 2101 of Pub. L. 104-188, 100 Stat. 1755, 1928, which amended the Portal-to-Portal Act).
>
> **Moreover, the fact that a driver may end his workday at a relief point, where his own vehicle is unavailable, does not transform what would otherwise be a simple work-to-home commute into compensable hours worked.** "Ordinary home to work travel is not compensable under the FLSA, regardless of whether or not the

employee works at a fixed location." *Imada v. City of Hercules,* 138 F.3d 1294, 1296 (9th Cir. 1998). See 29 C.F.R. § 785.35 ("An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites."). While it may be more awkward or inconvenient to arrange for transportation to and from work where the employees, like the drivers here, may begin or end their workday at diverse locations, such awkwardness or inconvenience does not change an otherwise non-compensable commute into compensable work time. (*Id*. at 1120-21). (Emphasis added).

In a more recent 10th Circuit case, *Smith et. al. v. Aztec Well Servicing Company,* 462 F.3d

1274 (10th Cir. 2006)("*Aztec*"), the 10th Circuit was confronted with a class action suit about whether

workers traveling to drill sites, some hours away in remote locations, were entitled to travel time

under the FLSA. A jury found in favor of the Plaintiff on the travel time claim. The District court

set that verdict aside and ruled in favor of the employer on a Motion for Summary Judgment as a

matter of law. *Id.* at 1283. The 10th Circuit first analyzed whether the District Court erred in limiting

the plaintiff's case to their traveled claims. *Id.* at 1284-1285. The case procedurally is similar to Mr.

WEAVER's who pled a vanilla overtime claim. As the case developed and apparently as the Plaintiff

learned he could fail on the travel (or ride) time case, he wanted to create a work before travel case.

The 10th Circuit in *Aztec* found that:

> When the plaintiffs finally raised the FLSA claims related to pre and post shift work at the well sites in the pretrial order, the district court acted within its discretion in refusing to allow the new claims. Because the pretrial order is the controlling document at trial, a plaintiff's "attempt to add a new claim to the pretrial order [is] the equivalent of asking leave to amend his complaint, and must be evaluated by the court under the standards set forth in *Rule 15 (a)*." *Minter c. Prime Equip. Co.,* 451 F.3d 1196, 1204 (10th Cir. 2006). While *Rule 15 (a)* provides that leave to amend "shall be freely given when justice so requires," *Fed. R. Civ. P. 15 (a)* if there has been undue delay on the part of the plaintiff in raising the claim, the district court may properly deny the motion as untimely. *See Duram v. Xerox Corp.,* 18 F.3d 836, 840 (10th Cir. 1994). When determining whether a newly raised claim is untimely under *Rule 15(a),* "[t]his Circuit. . . focuses primarily on the reasons for the delay. We have held that denial of leave to amend is appropriate when the party filing the motion has no adequate explanation for the delay." *Minter,* 451 F.3d at 1206 (quoting *Frank v. U.S. West,* 3 F.3d 1357, 1365-66 (10th Cir.

16

1993*))*. The plaintiffs offer no explanation for their 14-month delay other than the dubious assertion that "[u]ntil the district court's ruling at the pre-trial conference, [they] had no idea an amendment was necessary." Appellants' Reply Br. 19. We therefore find that the district court did not abuse its discretion by limiting the plaintiffs to the travel-time claims raised in their amended complaint. (*Aztec* at 1285).

The 10th Circuit not only denied the appellants' travel time claims, *Id.* at 1287-1290 but also denied their argument they were entitled to compensation for other activities like holding safety discussions during the commute, changing tires, putting chains, opening and closing gates, discussing work place safety, training new rig hands, planning for work they expected to encounter that day or that they were required to transport essential tools and paperwork while traveling to the sites. *Id.* at 1290-1291.

In a 2007 Southern District Florida case, *Powell et. al. v. Carey International, Inc.,* 514 F. Supp. 2d 1302 (S.D. Fla. 2007), limousine drivers were attempting to argue that their travel time to work was exempt from the Portal-to-Portal Act because they claimed they engaged in numerous work activities such as washing, cleaning and inspecting their vehicles and obtaining and placing amenities for their customers in the vehicle and other preparatory tasks. *Id*. at 1319, 1320. The District Court wrote:

> Here, it is not necessary to make those determinations to rule that commuting time is not compensable. Despite Plaintiffs' efforts to start the workday with these activities, even if they were compensable, there is nothing in the statutes, regulations, or case law to suggest that they could operate to make the subsequent drive to the principal activity anything other than noncompensable commuting time under the Portal-to-Portal Act. The Plaintiffs could choose to perform these activities anywhere on the path to the principal activity, or at the employer's place of business, and they cannot make their commute compensable by choosing to do them at home. **Regardless of where they perform these activities, and regardless of whether they are compensable, the drive from home to the place of performance of the principal activity is excludable under 29 U.S.C. § 254(a).** (*Id.* at 1320).  (Emphasis added).

Even if this Court found that Mr. WEAVER loaded and unloaded tools or some pieces of lumber, those activities would amount to nothing more than preliminary or postliminary activity

which was not an "integral and indispensable" part of that employee's work. The Department of Labor has provided persuasive examples of what is not compensable. See *Bonilla et. al. v. Baker Concrete Construction, Inc.*, 487 F. 3d 1340, 1343 (11th Cir. 2007) ("*Bonilla*"):

> Examples of walking, riding, or traveling which may be performed outside the workday and would normally be considered "preliminary" or "postliminary" activities are (1) walking or riding by an employee between the plant gate and the employee's lathe, workbench or other actual place of performance of his principal activity or activities; (2) riding on buses between a town and an outlying mine or factory where the employee is employed; and (3) riding on buses or trains from a logging camp to a particular site at which the logging operations are actually being conducted. (*Id.*) (citing 29 C.F.R. §§ 790.7(f)).

*Bonilla* involved the issue of whether workers were entitled to compensation for time spent traveling to a secure construction site under the FLSA. *Bonilla* at 1340. The District Court granted the employer's Motion for Summary Judgment, that it was not liable to pay this ride time under the FLSA. Our Circuit affirmed the District Court's Order of Summary Judgment. The employees in *Bonilla* were claiming they were entitled to compensation for riding on buses then passing through security check points before reaching the construction site. On the travel claim ("ride time") our Circuit found that:

> The plain language of section 254(a)(1) excludes "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities." The appellants' claim regarding the time spent on the employer vehicles both before and after the security check point fits squarely within this statutory exception, and the administrative interpretation of the statute also specifically addresses the question of transportation to and from the work site. The fact that the workers were required to ride authorized transportation after the security gate but the transportation to the security gate was optional is not relevant to the outcome of this case because even mandatory travel time is exempted from compensation under the Portal-to-Portal Act. We therefore hold before and after the security check point is exempt from compensation under the FLSA. (*Id.* at 1343).

The *Bonilla* Court then footnoted that other Circuits were consistent with its analysis on this issue. *Id.* at. fn. 3.

Examples of work that is "integral and indispensable" would include changing clothes at the

18

beginning of a shift in a battery plant where caustic, toxic materials are used and showering after the shift because of these chemicals. See *Steiner v. Mitchell,* 350 U.S. 247, 248; S. Ct. 330; 100 L. Ed. 267 (1956)("The precise question is whether workers in a battery plant must be paid as a part of their "principal" activities for the time incident to changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials. . .).

According to *Dade Co. Florida v. Alvarez*, 124 F. 3d 1380, 1383 (11th Cir. 1997)("*Dade Co.*"), "[t]he question of whether a particular set of facts and circumstances constitutes work under the FLSA is a question of law." (Citing *Birdwell v. City of Gadsden, Ala.,* 970 F.2d 802, 807 (11th Cir. 1992). As our Eleventh Circuit stated in *Birdwell v. City of Gadsden, Ala.*, ""it is for the court to determine if a set of facts gives rise to liability; it is for the jury to determine if those facts exist."" *Dade Co.* at 1383 (quoting *Birdwell v. City of Gadsden, Ala.* at 808).

In *Dade Co. v. Alvarez*, special response officers from the sheriff's office were required to maintain peak physical conditioning to maintain their position.  *Id.* at 1382. Our Eleventh Circuit noted that Congress did not define the words "work" or "employment when codifying the FLSA but rather left such definitions to the courts.  *Dade Co.* at 1384.  Our Circuit stated:

> Generally, courts have construed work to mean all activities "controlled or required by the employer and pursued necessarily and primarily for the benefit of his employer and his business."*Muscoda,* 321 U.S. at 598, 64 S. Ct. at 703 (holding that underground travel to iron ore mines was compensable work). Whether an off-duty activity is conducted predominately for the benefit of the employer depends on the degree to which an employee's freedom is undermined by the work-related activity. "It is clear that an employee's free time must be severely restricted for off-time to be construed as work time for purposes of the FLSA." *Birdwell*, 970 F.2d at 810 (holding that on-call waiting time was not compensable because "detectives' off-time was not so restricted that it was not used predominately for their benefit"); see also *Avery v. City of Talladega, Ala*., 24 F.3d 1337, 1347 (11th Cir.1994) (holding that meal time was not compensable because officers "are free to spend their meal breaks in any way they wish so long as they remain in uniform, leave their radios on, and do not leave the jurisdiction").  (*Id.*).

Mr. WEAVER's claim is primarily based upon him riding to the job site in an ABM truck.

Mr. WEAVER was not forced to ride in an ABM truck because he had the option of driving his own vehicle to any ABM job he was employed on.   (Exhibit G, ¶ ¶ 7-9; Exhibit F, ¶ ; Exhibit G, ¶ 5). In fact, Mr. WEAVER did drive to certain job cites while employed at ABM.  (Exhibit C, ¶ 2).

**IV.** **Plaintiff is not Entitled to Overtime Payments Because ABM does not have all the Time Records the Plaintiff filled out accounting for his Work Time.**

As our Supreme Court stated in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (U.S. 1946)("*Anderson*") (superseded in part by Congress passing the Portal to Portal Act.  See *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1278, FN 73 (11th Cir.2008)("*Morgan*").[5]  According to *Anderson*;

> An employee who brings suit under §§ 16 (b) of the Act for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated. The remedial nature of this statute and the great public policy which it embodies, however, militate against making that burden an impossible hurdle for the employee. Due regard must be given to the fact that it is the employer who has the duty under §§ 11 (c) of the Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy. It is in this setting that a proper and fair standard must be erected for the employee to meet in carrying out his burden of proof.
>
> When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work

---

[5]   *Morgan* is an unpublished opinion.  Federal Rule of Civil Procedure 32-1 allows the citation to unpublished opinions issued on or after January 1, 2007.  (Fed. R. Civ. P. 32-1 (a)).

for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. See Note, 43 Col. L. Rev. 355. (*Anderson* at 686-688).

In the Eleventh Circuit unpublished case of *Rance v. Rocksolid Granite USA, Inc*., 292 Fed. Appx. * 1 (11th Cir. 2008)("*Rance*"), our Circuit stated;

> To establish a prima facie case of an FLSA violation, Rance must show "as a matter of just and reasonable inference" the amount and extent of his work in order to demonstrate that he was inadequately compensated under FLSA. See *Caro-Galvan v. Curtis Richardson*, 993 F.2d 1500, 1513 (11th Cir. 1993) (citing *Donovan v. New Floridian Hotel, Inc*., 676 F.2d 468, 475 n.12 (11th Cir. 1982); *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680. 686-87, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946) v. Mt. Clemens Pottery Co., 328 U.S. 680. 686-87, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). Rance has failed to do so because his complaint and attached documentation provide no evidence of the amount and extent of his work. (*Rance* at *2-*3).

In *Allen v. Bd. of Pub. Educ*., 495 F.3d 1306 (11th Cir. 2007) ("*Allen*"), the *Allen* court stated;

> It is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment. *Id*. The employer is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed and "[e]mployees seldom keep such records themselves." *Id*. (*Allen* at 1315)(citing *Anderson* 328 U.S. at 687).

In the present case, there is no question that ABM kept accurate records of pay for its employees. (Doc. 14-1 through 14-3; Exhibit D). ABM produced these payroll records to Plaintiff's counsel. (Exhibit A, p. 29, l. 2-4; Exhibit D; Exhibit H, ¶ 3). Also, there is no question that Mr. WEAVER[6] had no idea what, if any, overtime he was due to be paid by ABM even after he received all of the records pertaining to his hours worked and pay. (Doc. 1; Exhibit A, p. 44, l. 25 to p. 45,

---

[6]

Mr. WEAVER applied for and was hired as a laborer by ABM. (Exhibit E, ¶ 11; Exhibit F, ¶ 4; Exhibit I).

l. 19; p. 60, l. 4-24).

**Wherefore**, for the above stated reasons, Defendant, ALLSTAR BUILDING MATERIALS, INC., requests that this Honorable Court grant its motion for summary judgment and deny Mr. WEAVER his claim as stated in his Complaint.

<u>CERTIFICATE OF SERVICE</u>

I **HEREBY CERTIFY** that on July 20, 2009,  I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to Jason L. Harr, P.A., Jason Harr, Esq., jasonharr@harrlawfirm.com, located at 1326 S. Ridgewood Ave., Suite One, Daytona Beach, FL 32114.  I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants: none.

s/ Frederick C. Morello
Frederick C. Morello, Esq.
Florida Bar No.: 0714933
lawarrior@advocates4justice.com
Michael G. Howard, Esq.
Florida Bar No.: 0636541
Mike@realacom.com
**FREDERICK C. MORELLO, P.A.**
111 N. Frederick Ave., 2nd Floor
Daytona Beach, FL 32114
(386) 252.0754
Fax (386) 252.0921
Attorneys for Defendant